UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET** |
| **VERSUS** | * | **NO. 09-249** |
| **JABAR GIBSON** | * | **SECTION: "C"** |

## DEFENDANT'S SENTENCING MEMORANDUM

**NOW INTO COURT,** by and through undersigned counsel, comes the defendant, Jabbar Gibson, who respectfully submits this sentencing memorandum in anticipation of his sentencing hearing, which is scheduled before this Honorable Court on October 27, 2010. For the reasons set forth below, Mr. Gibson respectfully moves this Honorable Court to apply the Fair Sentencing Act of 2010 and for a variance from the Sentencing Guidelines.

### Background

On February 3, 2010, Mr. Gibson pled guilty without a plea agreement to an indictment charging possession with intent to distribute five grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1). Rec. Doc. 1, p. 1. According to the Factual Basis of the guilty plea, Mr. Gibson had in his possession 5.4 grams. Rec. Doc. 23, p. 3. Before rearraignment, the government filed a § 851 bill of information charging a prior conviction

for a felony drug offense. This prior conviction brings Mr. Gibson's mandatory minimum sentence to 10 years' imprisonment under the law as it existed before the enactment of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, on August 3, 2010. In addition to the 10-year mandatory minimum, Mr. Gibson faces a consecutive five years' imprisonment as a result of his guilty plea to Count 2 of the Indictment, possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c).

## Argument

### I.

### The Court should sentence Mr. Gibson under the Fair Sentencing Act of 2010.

The Fair Sentencing Act of 2010 ("FSA") should apply to sentencings like Mr. Gibson's which occur after the effective date of the new law. Admittedly, the general saving clause, 1 U.S.C. § 109, provides that the repeal of a statute "shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide." Enacted in 1871 to abolish the common law rule that pending prosecutions abate when the governing statute is repealed, it has been applied to statutory sentence modifications. *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660-61 (1974); *United States v. Rojas-Colombo*, 462 F.2d 1091, 1092 (5th Cir. 1972). But it does not apply to remedial or procedural statutes. *United States v. Blue Sea Line*, 553 F.2d 445, 448 (5th Cir. 1977). Nor does it apply where there is "clear congressional intent" favoring retroactive application, even if there is no express command in the statute

itself. See *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). Congressional intent can be found in legislative history and in the circumstances prompting Congress to act as well as in statutory language. See Norman J. Singer *et al.*, 1A <u>Sutherland Statutes and Statutory Construction</u> § 22.36 (7th ed.). The FSA is a remedial statute, intended to remedy statutory misdirection and longstanding inequities. In passing the new law, Congress noted that a remedy was long overdue. It would contravene congressional intent to continue to apply the old law after Congress repudiated it.

Remarks on both the House and Senate floors reveal that Congress had two purposes in passing the FSA. One was to refocus prosecutions on "major" and "serious" dealers, as Congress had intended when it enacted the respective 10-year and 5-year mandatory minimums in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207. See *Kimbrough v. United States*, 552 U.S. 85, 95 (2007). The other was to put an immediate end to the racially disparate impact of crack cocaine sentences that were 100 times the length of sentences for the same quantity of powder cocaine. Congress chose to accomplish these twin goals by increasing the quantities of crack cocaine necessary to trigger the mandatory minimums, which in turn reduced the crack/powder ratio to 18-to-1.

These two purposes are apparent from the floor debates on the bill. Introducing the original Senate version of the bill, Senator Durbin, the assistant majority leader, noted that the low thresholds for crack cocaine under then-current law did not "focus on the most dangerous offenders" and "divert[ed] resources away from the prosecution of large-scale

drug traffickers." 155 Cong. Rec. S10490-91 (daily ed. Oct. 15, 2009). "In fact," Senator Durbin continued, "more than 60 percent of defendants convicted of Federal crack crimes are street-level dealers or mules." 155 Cong. Rec. S10491. Senator Leahy, the chair of the Senate committee which fashioned the final bill, reinforced the point:

> These penalties, which Congress created in the mid-1980s, have failed to address basic concerns. The primary goal was to punish the major traffickers and drug kingpins who were bringing crack into our neighborhoods. But the law has not been used to go after the most serious offenders. In fact, just the opposite has happened. The Sentencing Commission has consistently reported for many years that more than half of Federal crack cocaine offenders are low-level street dealers and users, not the major traffickers Congress intended to target.

155 Cong. Rec. S10492; see also 156 Cong. Rec. S1683 (daily ed. Mar. 17, 2010) (remarks of Sen. Leahy when bill brought to floor for vote).

Concern about the racially disparate impact of the old law also permeated the floor debates. Bringing the final version of the FSA to the Senate floor for a vote, Senator Durbin observed:

> ...the heavy sentencing we enacted years ago took its toll primarily in the African-American community. It resulted in . . . a belief in the African-American community that it was fundamentally unfair. . . . African-Americans make up about 30 percent of crack users in America, but they make up more than 80 percent of those who have been convicted of Federal crack offenses.

156 Cong. Rec. S1680 and S1681 (daily ed. Mar. 17, 2010). Senator Durbin assured that the bill, if enacted, would have an immediate effect.

> We have talked about the need to address the crack-powder disparity for too long. Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone

4

agrees is unjust. . . . If this bill is enacted into law, it will immediately ensure that every year, thousands of people are treated more fairly in our criminal justice system.

*Id.* Senator Leahy, the architect of the final bill, spoke next. Referring to the 100-to-1 ratio, he said:

> These disproportionate punishments have had a disparate impact on minority communities. This is unjust and runs contrary to our fundamental principles of equal justice under law. . . . In a letter to our committee, John Payton, the president of the NAACP Legal Defense Fund, called this disparity "one of the most notorious symbols of racial discrimination in the modern criminal justice system."
>
> . . .
>
> [T]his bill . . . helps ensure that our system will no longer affect many minority and urban communities more harshly than offenders who use drugs in the suburbs and corporate offices. That inequality has reduced trust in law enforcement and cooperation with police, which makes us all less safe.
>
> . . .
>
> Since 1995, the United States Sentencing Commission has issued report after report calling on Congress to address this unfair sentencing disparity. . . . Attorney General Eric Holder also reminded us that "the stakes are simply too high to let reform in this area wait any longer." I agree. It is time for the Senate and House to act.

156 Cong. Rec. S1683 (daily ed. Mar. 17, 2010). Immediately after his comments, the Senate passed the bill.

The need to end the disparate impact on African-Americans likewise infused the House debate. Congressman Scott, a lead sponsor, voiced concern about "the enormous growth in the prison population, especially among minority youth."

> The current drug sentencing policy is the single greatest cause of the record levels of incarceration in our country. One in every 31 Americans is in prison or on parole or on probation, including one in 11 African Americans. This is unjust and runs contrary to our fundamental principles of equal protection under the law. . . . According to the Sentencing Commission, restoring sentencing parity will do more than any other policy change to close the gap in incarceration rates between African Americans and white Americans.

156 Cong. Rec. H6198 (daily ed. July 28, 2010). Congresswoman Lee repeated that reducing the crack/powder disparity would relieve a burden that "fell heavily on poor African American and Hispanic communities."[1] 156 Cong. Rec. H6198, 6199. Congressman Lungren, who had helped draft the 1986 law, said Congress originally intended to help African-American communities by stopping a crack epidemic.

> Certainly, one of the sad ironies in this entire episode is that a bill which was characterized by some as a response to the crack epidemic in African American communities has led to racial sentencing disparities which simply cannot be ignored in any reasoned discussion of this issue. When African Americans, low-level crack defendants, represent 10 times the number of low-level white crack defendants, I don't think we can simply close our eyes.

*Id.* at H6202. Congressman Hoyer, the House majority leader, also described the "racial dimension" of the 100-to-1 disparity, which he said helped "to fill our prisons with African Americans disproportionately put behind bars for longer." *Id.* at H6203. Shortly after his remarks, the House passed the bill.

---

[1] Of note, Congresswoman Lee introduced a sentencing reform bill that explicitly excluded retroactive application. 156 Cong. Rec. H6202 (daily ed. July 28, 2010). A provision against retroactive application was not included in the bill that passed.

The twin purposes of the new law, as reflected in the floor remarks, demonstrate why courts should apply it to pending cases. The Fair Sentencing Act merely remedies the failure of the 1986 law to target the persons whom Congress intended. The remedy takes the form of changing the classes of persons subject to the mandatory minimums by increasing the threshold quantities in which they trafficked. In *United States v. Kolter*, 849 F.2d 541 (11th Cir. 1988), the Eleventh Circuit applied a new statutory definition of "convicted felon" retroactively to prosecutions for possession by a felon. The court held that the general saving clause did not apply because the new definition "merely altered the class of persons for whom the specified conduct is prohibited." *Id.* at 544. The same is true in the instant case. The Fair Sentencing Act does not change the mandatory minimum sentences but rather altered the classes of persons to whom they apply. Since the class definition – a specification of drug type and quantity in which the defendant trafficked – is an element of the offense, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the FSA "merely altered the class of persons for whom the specified conduct is prohibited." As in *Kolter*, the FSA is a remedial statute beyond the reach of the general saving clause.

The other purpose – to remedy the disparate impact of the old law – also calls for application to pending cases. The large proportion of young African-American men in prison is a matter of national concern. See Marie Gottschalk, "The Long Reach of the Carceral State: The Politics of Crime, Mass Imprisonment, and Penal Reform in the United States and Abroad," 34 Law & Soc. Inquiry 439 (2009). It impacts African-American representation

at the polls and in jury pools. It impacts the children whom fathers leave behind when they go to prison and it depresses their income when they are released. In the 1950s and 1960s civil rights activists were fighting segregation. Today, they are fighting felon disenfranchisement laws and excessive sentences. See, e.g., NAACP Legal Defense and Educational Fund website, www.naacpldf.org.

In *Hamm v. City of Little Rock*, 379 U.S. 306 (1964), the Supreme Court applied the Civil Rights Act of 1964 retroactively to invalidate state trespass convictions of sit-in participants pending on direct appeal. The trespass convictions were contrary to the public policy established by the Civil Rights Act. Hence, the Court declared, "there is no public interest to be served in the further prosecution of the petitioners." Similarly here, the application of the 10-year mandatory minimum to a person like Mr. Gibson, convicted of possessing with intent to distribute less than six grams of crack cocaine, contravenes the public policy of mitigating the racial disparity in incarceration rates embodied in the Fair Sentencing Act. Now that public policy has changed, "there is no public interest to be served" by enforcing sentences reflecting the discarded policy.

In addition, the circumstances attendant to the enactment of the new law militate in favor of immediate application. The Sentencing Commission has been telling Congress that the 100-to-1 crack/powder ratio had a racially disparate impact lacking in policy justification since 1995. U.S. Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (Feb. 1995) at xii. The Commission repeated its call for elimination or

reduction of the disparity in three subsequent reports.[2] It took 15 years for Congress to act. By then, change was overdue and Congress knew it. To continue using the old law in sentencing pending cases or in reviewing sentences on direct appeal is contrary to the urgency expressed by Congress when it passed the FSA. There is no reason to prolong the life of a law which, in Senator Leahy's words, "runs contrary to our fundamental principles of equal justice under law." 156 Cong. Rec. S1683 (daily ed. Mar. 17, 2010).

If this Court were to apply the FSA, the 5.4 grams of crack cocaine cited in the Factual Basis would not subject Mr. Gibson to a mandatory minimum sentence on Count 1 of the Indictment.

II.

The Court should vary downward from the career offender guideline.

The defendant's guideline range has been calculated by the United States Probation Office to be 322 to 387 months, roughly 26 to 32 years. This elevated calculation is based on Mr. Gibson's categorization as a career offender, pursuant to U.S.S.G. § 4B1.1, plus the consecutive 60 months he must receive for his § 924 (c) conviction. See Mr. Gibson's Presentence Investigation Report ("PSI"), page 16, paragraph 82.[3]

---

[2] The reports were submitted in February 1995, August 1997, May 2002, and May 2007. They are available at www.ussc.gov/reports.htm.

[3] Absent the career offender and the mandatory minimums provided by federal statutes, Mr. Gibson's guidelines on the drug charge would have been a total offense level of 21, with a criminal history category of IV, resulting in an imprisonment range of 57 to 71 months. See Mr. Gibson's Presentence Investigation Report, pages 6-7, paragraphs 21-29, and page 10, paragraph 40. The

9

The federal sentencing guidelines are but one factor which the Court must consider under Section 3553(a). The basic principle of 18 U.S.C. § 3553 (a) is for district courts to impose a sentence that is **"sufficient, but not greater than necessary"** to comply with the sentencing provisions set out in the statute (emphasis added):

(A) Retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment);

(B) Deterrence;

(C) Incapacitation (to protect the public from further crimes); and

(D) Rehabilitation (to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.)

Title 18 U.S.C. Section 3553(a)(2). Section 3553(a) further instructs the Court to consider the following factors in determining whether a sentence complies with the four purposes of sentencing listed above:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant (Section 3553(a)(1));

(2) The kinds of sentences available (Section 3553(a)(3));

---

guidelines advocate calculating the guidelines using the count of conviction that produces the higher offense level. See U.S.S.G. § 3D1.3(a). Under that provision, Mr. Gibson's guidelines on the felon in possession of a firearm count would also have resulted in a total offense level of 21, a criminal history category of IV, and an advisory imprisonment range of 57 to 71 months. Adding the 60-month consecutive sentence for the § 924(c) count would result in a suggested guideline range of 117 to 131 months.

(3)  The guidelines and policy statements issued by the Sentencing Commission, including the "advisory" guideline range (Section 3553(a)(4) and (5));

(4)  The need to avoid unwarranted sentencing disparity (Section 3553(a)(6)); and

(5)  The need to provide restitution where applicable (Section 3553(a)(7)).

Title 18 U.S.C. Section 3553(a)(2).

18 U.S.C. §3553 requires that a court "impose a sentence sufficient but not greater than necessary. . . ." Further, the statute instructs that a court consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the sentence "to reflect the seriousness of the offense," to provide deterrence and protect the public, to provide the defendant with educational and vocational training and medical treatment "in the most effective manner," the sentencing options, and the sentencing guidelines.

The Court must consider whether the sentence will provide adequate deterrence and provide time for rehabilitation. The defendant respectfully submits that a sentence below the suggested guidelines range would provide adequate deterrence. In **United States v. Williams**, 435 F.3d 1350 (11th Cir. 2006), the Eleventh Circuit affirmed a downward variance from the career offender based guidelines of 188 to 235 months, and upheld the sentence of 90 months imposed by the district court. In **Williams**, the district court weighed the sentencing factors of Title 18 United States Code Section 3553(a) and found that the

official, minimum guidelines range of 188 months was far greater than necessary to provide deterrence and just punishment. In **Williams**, the district court compared the career offender guidelines with the non-career offender guidelines, noted the disparity, and determined that a 90 month sentence would best comport with the sentencing requirements of Section 3553(a).

In the instant matter, Mr. Gibson faces a career offender guideline range of 322 to 387 months. It is respectfully submitted that the current guidelines range is far greater than necessary to provide deterrence and promote respect for the law. There is no need for such an extended period to provide for the incapacitation of the defendant to protect the public. Furthermore, a sentence of less than 322 months would also provide the time necessary to complete any efforts at rehabilitation with the Bureau of Prisons. Mr. Gibson would like to obtain his G.E.D. He also expressed a desire to obtain vocational training so that he could obtain and maintain gainful employment so he can support his family upon his release. It will not require over 322 months to accomplish these goals.

**WHEREFORE**, it is respectfully requested this Court consider all of the factors set forth in 18 U.S.C. §3553(a) and impose a reasonable sentence that is below the recommended guideline range which takes into account the disparate sentences for crack cocaine.

Respectfully submitted this 15th day of October, 2010.

                VIRGINIA LAUGHLIN SCHLUETER
                Federal Public Defender

                /s/ Valerie Welz Jusselin
                VALERIE WELZ JUSSELIN
                Assistant Federal Public Defender
                Hale Boggs Federal Building
                500 Poydras Street, Suite 318
                New Orleans, Louisiana 70130
                Telephone: (504) 589-7930
                Bar Roll No. 19825
                Email: valerie_jusselin@fd.org

## **CERTIFICATE**

I hereby certify that a copy of the foregoing Sentencing Memorandum has been served on Edward Rivera, Assistant United States Attorney, and Cheryl Robert, United States Probation Officer, both at 500 Poydras Street, New Orleans, Louisiana 70130 by hand-delivering same, this 15th day of October, 2010.

VALERIE WELZ JUSSELIN
Assistant Federal Public Defender